**SECOND DIVISION**
**MILLER, P. J.,**
**BROWN and GOSS, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**February 12, 2019**

# In the Court of Appeals of Georgia

A18A1956. KELLY v. THE STATE.

A18A2030. BARGE v. THE STATE.

BROWN, Judge.

In these consolidated appeals, Rashawn Kelly and Tommy Barge assert that insufficient evidence supports their convictions. For the reasons explained below, we find that sufficient evidence supports Kelly's convictions of possession with intent to distribute marijuana (two counts), possession of hydrocodone, and possession of methylone. Based upon the State's failure to present sufficient evidence of a nexus between Barge's commission of a predicate act and an intent to further gang activity, we reverse Barge's conviction for criminal gang activity.[1]

---

[1] Barge does not contend in this appeal that insufficient evidence supports his remaining conviction of possession with intent to distribute.

When evaluating a challenge to the sufficiency of the evidence, we view all of the evidence admitted at trial in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. This evaluation essentially addresses whether the government's case was so lacking that it should not have even been submitted to the jury. Our limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts.

(Citations and punctuation omitted.) *McGruder v. State*, 303 Ga. 588, 590 (II) (814 SE2d 293) (2018). So viewed, the record shows that a narcotics investigator received information on January 23, 2013, from an anonymous source on a tipline that vehicles were parking in front of a residence owned by defendant Kelly's mother for a brief period of time and leaving after a young man emerged from the house and some type of exchange took place with the occupants of the vehicles. Based upon the investigator's knowledge that this was a common method to distribute drugs, the officer collected trash abandoned at the curb of the home, searched it, and discovered green leafy material, stems, and seeds that tested positive for marijuana, small plastic jeweler's bags commonly used to sell small amounts of marijuana, as well as a

2

hospital wristband dated January 19, 2013, and a prescription bottle filled in 2009, both bearing Kelly's name.

Based upon the items found in the trash, the investigator obtained a search warrant for the residence of Kelly's mother. In the sole closet of a bedroom that Kelly shared with his 14-year-old brother, the police officers found green leafy material in small ziplock jeweler's bags placed in a blue plastic container, and a metal tea box containing more marijuana. They also located a "pay-owe log" underneath the queen-sized mattress in the same bedroom, and inside the night stand drawer, they found a digital scale with green leafy material on it that was disguised to look like a cell phone, as well as a cell phone provider receipt with Kelly's name and a date of January 27, 2013. Finally, they discovered a prescription bottle containing acetaminophen-codeine elixir[2] listing the name of Ryanne Hensley. Kelly was not present at the time the search was conducted, and no names appear on the pay-owe log.

The police investigation revealed no connection between defendant Barge and the residence owned by Kelly's mother. The room shared by Kelly and his brother

---

[2] A GBI crime lab employee testified that this elixir tested positive for hydrocodone.

3

contained a twin bed and a queen bed, with the queen bed used by Kelly. While the investigator observed some "red clothing in the room where the evidence was found," the anonymous tip contained no information about gang affiliation or red clothing.

Based upon the evidence found during the execution of the search warrant, the narcotics investigator obtained an arrest warrant for Kelly charging him with possession of marijuana with the intent to distribute and possession of the codeine elixir. On February 15, 2013, a sheriff's deputy was conducting surveillance of Barge's residence in Loganville, Georgia when he saw Kelly arrive in a vehicle with two women. The deputy knew that Kelly had warrants for his arrest based upon a search of his home, and called for back-up. After Kelly went inside the house, the officers decided to approach. When Kelly and Barge ran out the back, they were stopped by two deputies stationed outside the back door. Kelly was carrying a green backpack and Barge was carrying a black one.

During a patdown search of Kelly, a deputy found three bags containing green leafy material in his jacket pocket, two white methylone capsules in the change pocket of his pants, "a wad of cash," and a red bandana in his right back pocket. In the green backpack, the deputy discovered another bag containing 1.5 ounces of marijuana, small jeweler's bags, some cigar blunt wrappers, and another red bandana.

4

Inside the black backpack carried by Barge, the deputies found two bags of marijuana, rounds of ammunition, as well as a red bandana, a scale, and several small plastic baggies. A police officer testified that the individual packaging of the marijuana found in Kelly's jacket, along with the other items found in his green backpack, were "some indication of possession with intent" to distribute.

On the same day that Kelly and Barge were arrested, the police applied for and obtained a search warrant for Barge's residence. A search of Barge's room revealed a black digital scale, several small baggies, three red hats, red gloves, a five-pointed red star on a red-beaded necklace, two pairs of red shoes, and a black pellet gun.

The State presented a Gwinnett County police officer assigned to the gang unit at the time of the offenses at issue as an expert in criminal street gangs. The expert testified that Kelly and Barge had both been affiliated with the Bloods street gang, a national gang with various sects that had existed in Gwinnett County for at least 12 years. In his expert opinion, Kelly and Barge were leaders of the "G-Shine Bloods," a sect within the "East Coast Blood gangs." With regard to Barge, the expert testified that he documented his association with four other G-Shine Bloods. The expert explained that Bloods are associated with the color red, wearing a red bandana on the right side of their body, and identify themselves as a member of the gang by wearing

5

red clothing, such as a red Chicago Bulls hat, red jewelry or a five-pointed star, by using certain hand signs and symbols, and through the use of tattoos. East Coast Bloods "are well-known for drug sales and drug distribution," and gang members promote their position in a gang by "[p]ortraying a certain image, whether it be that you're wealthy, that you have power or influence." He testified that in December 2012, a couple of months before Kelly and Barge were arrested, he reviewed their Facebook pages. Barge's page included multiple photos depicting him with a red bandana draped over his head or neck while making a Blood gang hand sign. Another photo showed a Chicago Bulls hat and 11 bills of cash spread out on top of a red bandana; the expert opined that this photograph "basically stat[ed] that they're making money and they're paying homage to the gang by placing the money on the paraphernalia associated with the gang." A photo showing Kelly and Barge throwing Blood gang hand signs appeared on both men's Facebook pages. According to the expert, a person who falsely claims or "flags" that they are a member of a gang "could result in [him] getting violated, and that can encompass anything from a very bad beating to death."

Barge testified that he posted the gang-related photos on his Facebook page to stop getting bullied and attacked in his neighborhood. He also admitted that he wore

6

a bandana "when I'm going to places where I feel like I'm in danger or threatened." He stated that the photograph of the money and Chicago Bulls hat lying on top of the red bandana meant that he was getting money and protected by the Bloods. He explained that he "didn't care" about the risk "if anybody real finds out that I'm not a real Blood" because he had "to protect myself on a daily basis" in the neighborhood. He denied ever hearing the term "G-Shine Blood" or being an actual member of a gang. He admitted that he was smoking marijuana in the back yard immediately before he and Kelly were arrested, but denied that he was wearing the black backpack or that the marijuana found inside it belonged to him.

Kelly admitted in his testimony at trial that he was asked to hold the marijuana found in the bedroom closet for a cousin that was about to be incarcerated, as well as the liquid codeine elixir. He claimed that he had permission to smoke the marijuana and had no plans to sell it. He denied all knowledge of the ledger and digital scale found in the bedroom. He also claimed that he no longer lived in the bedroom at his mother's house at the time of the search. With regard to the marijuana found on his person and in his backpack at the time of his arrest, he also asserted that it was for personal use. He denied being a member of the G-Shine Blood gang, testifying that after he and Barge were teased and assaulted, they placed the pictures on Facebook

7

to create the illusion that they were gang members as a means of protection. After he pretended to be a member of the gang, the bullying "stopped drastically."

1. In Case No. A18A1956, Kelly asserts that insufficient evidence supports his convictions. Based upon the evidence outlined above, we conclude that the State met its burden of proof under the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). While Kelly denied that he intended to distribute the marijuana, the jury was entitled to disbelieve his testimony and conclude from the packaging of the marijuana, the empty jeweler's bags, and the officer's testimony that the packaging provided evidence of intent to distribute, as well as the location of the digital scale, pay-owe log, and recent cell phone receipt in the bedroom, that Kelly had the requisite intent to distribute. See *Horne v. State*, 318 Ga. App. 484, 486-487 (1) (733 SE2d 487) (2012) (packing of contraband can demonstrate it is held for distribution); *White v. State*, 310 Ga. App. 386, 389 (2) (a) (714 SE2d 31) (2011) (jury entitled to disbelieve testimony that contraband belonged to another). With regard to the possession counts, Kelly's admission that he was holding the hydrocodone and methylone for another amply supports his convictions on those counts.

2. In Case No. A18A2030, Barge contends that insufficient evidence supports his conviction of criminal gang activity. Assuming, without deciding, that sufficient evidence shows that Barge actively participated in an illicit street gang, the State failed to present evidence showing a sufficient nexus between Barge's commission of a predicate act and an intent to further the gang activity. See *Rodriguez v. State*, 284 Ga. 803, 807 (1) (671 SE2d 497) (2009).

"[T]he State was required to prove something more than the mere commission of a crime by gang members." (Citation and punctuation omitted.) *In the Interest of W. B.*, 342 Ga. App. 277, 281 (801 SE2d 595) (2017). "[I]t is essential that the State demonstrate that the commission of the predicate act was intended to further the interests of the gang." (Citation and punctuation omitted.) Id. at 281-282. As we have previously explained,

> This requirement is satisfied by evidence that the gang received the proceeds from or otherwise benefitted from the commission of a particular crime. Evidence showing that a crime was done in retaliation for some act or insult committed against the gang or its members will also serve to show that the crime furthered the gang's interests. Additionally, Georgia courts have previously held that evidence showing that the crime was committed in a highly visible manner so as to allow witnesses and victims to discover that a particular gang committed the crime, or evidence that the purpose of the crime was to

9

establish, reinforce, or enhance the gang's reputation satisfies the nexus requirement. This requirement is also satisfied where the State shows that gang members referenced a particular incident on social media so as to establish that the gang was responsible for a specific crime, either for the purpose of enhancing the gang's reputation or intimidating others. And evidence, including social media posts, that a specific gang member perpetrated the crimes so as to promote himself within the gang hierarchy would also suffice to prove the required nexus.

(Citations and punctuation omitted.) Id. at 282.

Here, the indictment alleged that Barge participated in criminal gang activity on February 15, 2013, by possessing marijuana with the intent to distribute it. The evidence upon which the State relies to show a nexus between Barge's possession of the marijuana concealed in his backpack and an intent to further the gang activity is that he and Kelly were "'repping'" their gang at the time they possessed the drugs because Kelly was wearing a red bandana in his right back pocket and Barge had a red bandana inside the backpack he carried. The State also points to the expert's testimony that East Coast Bloods "are well-known for drug sales and drug distribution" and gang members promote their position in a gang by "[p]ortraying a certain image, whether it be that you're wealthy, [or] that you have power or influence."

This evidence fails to satisfy the State's burden. While Kelly might have been "repping" the gang generally by wearing the red bandana in his pocket, there was no evidence that he or Barge possessed or distributed the marijuana in a highly visible manner or that they referenced this particular crime on social media to enhance the gang's reputation. The expert's testimony about the East Coast Bloods' general reputation for drug sales and distribution also provides insufficient evidence that this particular transaction furthered the interests of the gang. See *Interest of W. B.*, 342 Ga. App. at 278-279, 283 (finding insufficient evidence of nexus between burglary and intent to further gang activity even though expert witness testified that gang was known to engage in burglaries). Accordingly, we reverse Barge's conviction for criminal gang activity. See id.

*Judgment affirmed in Case No. A18A1956 . Judgment reversed in Case No. A18A2030. Miller, P. J., and Goss, J., concur.*